IN THE

# United States District Court for Maine

| | | |
|---|---|---|
| ANDREW U. D. STRAW, | ) | Case#: |
| *Plaintiff,* | ) | |
| | ) | Hon. |
| v. | ) | Judge Presiding |
| | ) | Hon. |
| UNITED STATES | ) | Magistrate Judge |
| RE: TYDINGS-MCDUFFIE ACT, AND | ) | |
| REPUBLIC OF THE PHILIPPINES, | ) | |
| *Defendants.* | ) | JURY TRIAL NOT DEMANDED |

## AMENDED COMPLAINT

COMES NOW, *pro se Plaintiff* ANDREW U. D. STRAW (hereinafter "Plaintiff"), individually, hereby state as follows that as a U.S. citizen living in the Philippines for over 7 years, I need to know as a declaration of law if the United States must consider me to be living in the United States and the Philippines must not consider me as a foreigner, and I seek several declarations of that nature to define my rights under U.S. law and the Constitution. I make this amendment to excise reference to the 1946 proclamation, which is irrelevant to whether Congress had power to create a nation, and my interpretations of the required date, which were incorrect but irrelevant to the constitutional issues here. To wit:

## FACTS & BACKGROUND

1. This Complaint alleges a federal cause of action and is brought solely pursuant to 28 U.S.C. § 2201 and FRCP Rule 57, seeking declaratory judgments that affect the rights of Andrew U. D. Straw and others so situated, Americans traveling to the Philippines and Filipino citizens themselves, once the law is settled. It is not settled.

2. I am a U.S. citizen, born at Camp LeJeune U.S. Marine Corps Base in North Carolina on 3/19/1969.

1

3. I claim my right to own land in the Philippines was taken from me through the legislative act of granting independence, an action not constitution per any listed power of Congress, and against my Takings Clause rights that are explicitly listed in the Fifth Amendment. NB Perplexity AI: **Exhibits 3 & 4**.

4. The Philippines was purchased from Spain in 1898 for $20 million after the Spanish-American War and this fact should be noticed as true.

5. No Filipino paid anything to purchase the Philippines Islands from the USA.

6. In 1934, the ==Tydings-McDuffie Act== was passed, creating a **"Commonwealth of the Philippines"** with its own constitution and laws but with the U.S. federal government retaining **power over foreign relations and U.S. sovereignty**.

7. The **Tydings-McDuffie Act** was enacted as **Public Law 73-127** and originally was published at **48 Stat. 456**. It was enacted on **March 22, 1934**, after approval by the 73rd United States Congress to provide for the Philippines' transition to independence after a ten-year Commonwealth period.

8. Whether granting that independence and creating a sovereign nation for the first time was **constitutional** is not addressed in the Act and has never been addressed to my knowledge.

9. ==Exhibit 1== contains the text of the Act.

10. This law was not a treaty because no Philippines nation existed apart from the United States in 1934. The Philippines was a U.S. territory, not a nation. The Act was not billed as a Treaty and was passed in the House and Senate as *legislation*. It was a Public Law.

2

11. In 1935, under the provisions of the Act, the **1935 Constitution of the Philippines** was drafted and became law, establishing the Commonwealth of the Philippines with an elected executive, the **president of the Philippines**.

12. That president was equivalent in power to a U.S. state **governor** or the **governor** of other territories such as Guam or Puerto Rico or Virgin Islands.

13. It may be useful to compare this law with the law creating the Commonwealth of Puerto Rico, which island was also ceded to the United States after the Spanish-American War of 1898.

14. According to the Insular Cases, Puerto Rico is "a territory appurtenant and belonging to the United States, but not a part of the United States within the revenue clauses of the Constitution." *Downes v. Bidwell*, 182 U.S. 244, 287 (1901); *Balzac v. Porto Rico*, 258 U.S. 298 (1922).

15. Puerto Rico also is governed by a constitution enabled by two U.S. federal laws very similar to the Tydings-McDuffie Act: P.L. 81-600 & P.L. 82-447.

16. Unlike the Philippines, Puerto Ricans were granted **U.S. citizenship** in 1952. 8 U.S.C. § 1402. (6/27/1952, 66 Stat. 236.) https://www.law.cornell.edu/uscode/text/8/1402

17. One island territory, The Philippines, was granted nationhood and the other was granted its residents being **citizens of the U.S.A.** These are opposites.

18. Guam residents, very near the Philippines, were granted U.S. citizenship in 1950. 8 U.S. Code § 1407 https://www.law.cornell.edu/uscode/text/8/1407

19. Virgin Islands residents were granted citizenship as of 1927 in 1952. 8 U.S. Code § 1406 https://www.law.cornell.edu/uscode/text/8/1406

20. Thus, it appears that the Philippines had the status of a territory from 1898 to 1934 but then became **a Commonwealth** from 1934-1946. Having a constitution approved by the President of the United States and ratified by the People of the Philippines is very similar to what happened in 1958 and 1959, when Alaska and Hawaii became states. But other territories have constitutions also, such as the one for Puerto Rico: https://faolex.fao.org/docs/pdf/pue126720E.pdf (Puerto Rico)

21. Guam and U.S. Virgin Islands, by contrast, have not adopted any constitution.

22. The **Alaska Statehood Act** (Pub. L. 85-508, 72 Stat. 339) was passed by the U.S. Congress and signed into law by President Eisenhower on **July 7, 1958**. Statehood happened with the **declaration** of President Eisenhower on **January 3, 1959**. Thus, Alaska became a state with a vote of 210-166 in the House and 64-20 in the Senate.

23. **An Act to Provide for the Admission of the State of Hawaii into the Union** (Pub. L. 86–3, 73 Stat. 4, enacted **March 18, 1959**) is a statute enacted by the United States Congress and signed into law by President Dwight D. Eisenhower which dissolved the Territory of Hawaii and established the State of Hawaii as the 50th state to be admitted into the Union. This Act passed the House, 323-89, and the Senate, 76-15. Statehood became effective on **August**

**21, 1959**, when Eisenhower **declared** it as the final requirement under Section 7(c) of the Act.

24. There are several different trajectories for territories of the United States. They can remain territories with residents being merely nationals, like American Samoa. They can remain territories with residents becoming U.S. citizens, like Northern Mariana Islands, Guam, Virgin Islands, and Puerto Rico. They can become states like Alaska and Hawaii did in 1959.

25. There is only one example of a U.S. territory renouncing its allegiance to the USA and becoming a foreign country and the USA *accepting it*. That example is the Philippines.

26. Congress allowed the Philippines to have its own currency, creating the Philippines peso in 1903, something Congress could do because it is a power listed in Article I, Section 8.

27. https://www.bsp.gov.ph/Pages/CoinsAndNotes/HistoryOfPhilippineMoney/HistoryOfPhilippineMoney.aspx

28. Guam, Commonwealth of Mariana Islands, American Samoa, Virgin Islands, and Puerto Rico all use the U.S. dollar as currency.

29. Philippines revolutionaries were printing their own money in the Philippines in 1898 but stopped when the USA took control. See URL at ¶25.

30. The currency used in the Philippines was created by the U.S. Congress and it was called the peso. It was pegged to the U.S. dollar in value.

31. The Philippines continues to have a currency of that name.

32. It is true that states (not territories) have tried to renounce the Union and secede without Congress' approval, but that was during the U.S. Civil War and those places were returned to the United States after much bloodshed.

33. The Supreme Court after the Civil War had very strong words for the notion that a state could secede. **They can't.** *Texas v. White*, 74 U.S. 700 (1868). https://supreme.justia.com/cases/federal/us/74/700/

34. That case at *701 mentions a constitutional power to **suppress rebellion**. But it doesn't mention a power to ***encourage rebellion*** so much that a new nation is created.

35. The Tydings-McDuffie Act is a law made by Congress to ***encourage a rebellion*** against the United States and reward it with nationhood, but it does so in an orderly fashion. That's the difference between Civil War and what the Philippines did; but there were no American soldiers killed in the 1930s by revolutionaries in the Philippines. Changes happened by law.

36. It is of note, reviewing the Tydings-McDuffie Act, that Filipinos were obligated to have allegiance to the United States under that law. It is odd that the same law that requires allegiance would then allow those same people to **renounce allegiance and secede**. It is congressionally-sanctioned rebellion and secession. A more orderly secession than the Civil War, but secession nevertheless.

37. No Filipino paid anything to buy the Philippine Islands even though it cost the USA $20 million to purchase it from Spain in 1898. Thus, the United States in giving the Philippines Islands to the People of the Philippines gave property

worth $20 million in 1898 dollars. Perplexity.ai says the conversion of $20 million in USD to 1946 USD yields $47,000,000 gift in 1946.

38. There were 19,234,182 Filipinos in 1946, it has been estimated. Thus, dividing the gift by the population, the USA gave every Filipino USD$2.44. Nothing was given in return. And in 1987, Americans were forbidden as foreigners to own land in their own names in the new Philippines Constitution. This may seem ungrateful, to disallow an American to buy land that his country **gave at no cost** to Filipinos as a group, even when a Filipino wants to sell it to an American today.

39. Incidentally, $20 million in 1898 USD is **$774,600,000** in 2025 USD value.

40. Legislation must be constitutional and the federal courts decide whether they are or not and to what extent. *Marbury v. Madison*, 5 U.S. 137 (1803), was the case that established judicial review of statutes for constitutionality.

41. The FRCP has a provision for cases where a statute is being considered for its constitutionality. FRCP 5.1(c) requires the Court to inform the Attorney General of the United States when a statute is challenged for constitutionality, as I do here. 28 U.S.C. §2403 https://www.law.cornell.edu/rules/frcp/rule_5.1

42. Thus, this law must have been passed under one of the enumerated powers of Congress in Article I. Congress does not have the plenary power exercised by other nations. It is limited by the Constitution. The Bill of Rights has a

provision     explaining     this.     U.S.     Const.     Am.     X.

https://constitution.congress.gov/constitution/amendment-10/

43. The Tenth Amendment is relevant because it shows where powers reside. If a power is not given to the national government and a state is prohibited from doing it, that power resides with the People. The Declaration of Independence was an example of The People exercising their power to create a nation.

44. The fact that We The People, actually mentioned in that Declaration, have the power to make a nation-state means the U.S. government does not have that power and neither do states. That fact was not changed by the language of the Constitution. The United States and its federal government cannot simply create nations by statute or proclamation. That is a power that resides with The People. And we know The People is a real entity because they are mentioned BOTH in the Tenth Amendment AND in the Declaration of Independence. The Ninth Amendment mentions The People also, reserving rights                          to                          them.

https://constitution.congress.gov/constitution/amendment-9/

45. There are only two examples of American government creating a sovereign nation. The first time was the creation of the United States. But there was no United States to have that power at the time. That was colonists calling themselves "The People" creating a new nation **themselves** on July 4, 1776. It was **not any government** doing it and in fact it was done to *reject* a nation-state that was being abusive.

8

46. The *only example* of the United States after ratification of the U.S. Constitution in 1789 creating a **sovereign nation** was on **July 4, 1946**, when the "Treaty of Manila" recognized independence to a nation that did not exist on **July 3, 1946**.

47. See: https://history.state.gov/countries/philippines

48. President Harry S. Truman issued **Proclamation 2695** of <mark>July 4, 1946</mark>.

49. It is notable that my grandfather was serving in the United States Navy at that time and served in the Pacific Theater. **Exhibit 2**, Service Record of Gerald LeRoy Isaacs. He earned a <mark>bronze star</mark> medal for participating in the Gunto Operation to liberate Okinawa in April-May 1945. **Exhibit 2, page 1**.

50. It mattered to my grandfather, clearly, whether the Philippines was United States or Japan. So, it matters to me. As a resident of Occidental Mindoro, I live very near a place he and his comrades liberated 80 years ago this year.

51. The National Museum of the Pacific War said, even more poignantly, "Nevertheless, after the United States came under attack by Japanese forces on 7 December 1941, the soldiers of the 1st and 2nd Filipino Regiment fought for the United States and <mark>their right to citizenship</mark>."

52. Moreover:

> Overcoming enormous obstacles, Filipino-Americans united to liberate their homeland. <mark>Many of these Filipinos gained U.S citizenship through their service</mark> and using their credentials and experiences were able to find better fortunes in America. The 1st and 2nd Filipino Infantry Regiments served the United States and, in the process, uplifted their community and helped it thrive. While many Filipino World War II veterans are still without benefits or any reward for their service, in 2017 Filipino veterans received the Congressional Gold Medal, honoring

their            contribution            to            the            war.

https://www.pacificwarmuseum.org/about/news/filipino-regiments

53. While the Treaty of Manila was signed on July 4, 1946, and ratified by the Senate, no test of its constitutionality with respect to U.S. citizens and their rights was ever adjudicated. The Treaty of Manila was ratified by the U.S. Senate on July 31, 1946, and by the Philippines on September 30, 1946. The treaty entered into force on October 22, 1946, after the exchange of ratifications.

54. But if the Philippines could not be turned into a sovereign nation by Congress, was the Treaty of Manila like having a Treaty with a ghost? Something not real, insubstantial?

55. It is also a fact that during the Commonwealth period, appeals could be made from the highest court in the Commonwealth to the <mark>U.S. Supreme Court</mark>. *In re Yamashita*, 327 U.S. 1 (1946). Justices vehemently dissented from that death case over whether the U.S. Constitution's Fifth Amendment applied in the Philippines. That question was not clearly decided. https://supreme.justia.com/cases/federal/us/327/1/

56. As a territory of the United States, rings as property in 1901 had the right to enter the United States without tariffs imposed because it was not an import from a foreign country. *Fourteen Diamond Rings v. United States*, 183 U.S. 176 (1901).

57. Prior to the 1934 enactment creating the Commonwealth of the Philippines Islands, there was an entity known as the "Government of the Philippines Islands," which was a territorial government.

58. Did the nature of the government in the Philippines change in 1934? From what to what?

59. American states are called commonwealths sometimes. This includes Virginia, where I had my first bar admission, Pennsylvania, and Kentucky.

60. Note that Congress in **Section 16** of the Tydings-McDuffy Act anticipated the possibility that some part of the Act could be considered **unconstitutional**. This was a severability clause. **Exhibit 1**.

61. To my knowledge, no one has ever brought suit to test whether this Act was constitutional and the impact on U.S. citizens visiting the Philippines losing their American constitutional rights as a result of it.

62. One very clear difference in rights is the right to travel within the United States versus international travel. As the U.S. Supreme Court said, "the constitutional right of interstate travel is virtually unqualified," while international travel can be regulated more easily. *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978). *See: Straw v. CMS*, 1:20-cv-01315-RDB (D.Md. 2020)

63. One other especially important doctrine affected by the independence of the Philippines is the extraterritoriality doctrine. My rights have been limited by this doctrine. *Straw v. U.S. Department of State*, 1:19-cv-02294 (D.Md. 2020):

> "[i]t is a longstanding principle of American law that **legislation of Congress**, unless a contrary intent appears, **is meant to apply only**

within the territorial jurisdiction of the United States." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010); see *also Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). The presumption against extraterritoriality "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." *Morrison*, 561 U.S. at 255. Thus, **a statute is presumed to stop at the borders of the United States**, absent clear congressional intent of extraterritoriality. See id.; see also *RJR Nabisco, Inc. v. European Cmty.*, ___ U.S. ___, 136 S. Ct. 2090, 2102 (2016) (explaining that "the presumption can be overcome only by a clear indication of extraterritorial effect," although "an express statement of extraterritoriality is not essential"); *Kiobel*, 569 U.S. at 118; *Reyes-Gaona v. N.C. Growers Assoc.*, 250 F.3d 861, 864 (4th Cir. 2001) ("The presumption against extraterritoriality 'can be overcome only if there is an 'affirmative intention of the Congress clearly expressed.'") (quoting Aramco, 499 U.S. at 248). Stated otherwise, **"[w]hen a statute gives no clear indication of an extraterritorial application, it has none."** *Morrison*, 561 U.S. at 255.

64. https://www.courtlistener.com/opinion/9737044/straw-v-us-department-of-state/

65. Thus, whether a place is **within the USA or not** as a matter of law is extremely important for the application of this doctrine, which can expand or extinguish a U.S. citizen's rights under federal statutes and the U.S. Constitution itself.

66. That 1934 law, **Exhibit 1**, purported to create a political entity under the United States with the **eventual goal of independence** from the United States and the creation of a foreign nation.

67. Since 1945 and the end of WWII, the Philippines was purportedly granted independence on July 4, 1946, with a proclamation by the President.

68. The so-called "Treaty of Manila" granted independence to the Commonwealth of the Philippines, though technically, I allege, there was no Philippines foreign

nation at that time with which to engage in treaties. Treaties are not formed between nations and non-nations.

69. Treaties are primarily formal agreements between sovereign states (nations) or, in some cases, international organizations with international legal personality. According to the Vienna Convention on the Law of Treaties, which is the key international legal framework governing treaties, a treaty is defined as "an international agreement concluded between States in written form and governed by international law." This means that treaties are typically formed between entities recognized as having full international legal personality, such as sovereign states or certain international organizations.

70. Non-nation entities, such as individuals, groups without international personality, or subnational units, cannot be parties to treaties under international law. The major distinguishing characteristic of a treaty is that it is concluded between sovereign nation-states with full international personality; individuals or groups without such status cannot be parties to a treaty.

71. International organizations can be parties to treaties if they have international legal personality. For example, the United Nations and some other international organizations can enter into treaties with states or other international organizations.

72. Agreements involving non-sovereign entities or subnational units (like states or provinces within a country) are not considered treaties under international

law. Such agreements are often domestic or administrative and do not have the binding force of international treaties.

73. In summary, treaties are formed between sovereign states and, in some cases, international organizations, but not with non-nation entities or individuals. The legal capacity to enter into treaties is reserved for those with recognized international personality.

74. Philippines forces fought alongside American forces during WWII and were considered American troops at the time.

75. During the territory period, the U.S. Supreme Court did not consider the Philippines to be a foreign nation at all. It was considered U.S. soil and this has been precedent since 1901. *See: Fourteen Diamond Rings v. United States*, 183 U.S. 176 (1901) (5-4 decision).

76. https://supreme.justia.com/cases/federal/us/183/176/

77. The U.S. government's actions were both the proximate and actual cause of the loss of U.S. citizen property rights; this is precisely the situation the Takings Clause is designed to address—government action causing the loss of private property rights for public ends, here, the policy goal of granting a territory independence.

78. The absence of compensation, while perhaps supported by narrow historical precedent, fails to recognize the full constitutional right of citizens and the distinct character of this "taking"—a ***legislative act*** directly stripping

Americans of their rights, with ***no outside sovereign involved*** in the deprivation until after the U.S. had already acted.

79. The government's actions were both the proximate and actual cause of their loss of rights; this is precisely the situation the Takings Clause is designed to address—government action causing the loss of private property rights for public ends, here, the policy goal of granting a territory independence.

80. The absence of compensation, while perhaps supported by narrow historical precedent, fails to recognize the full constitutional right of citizens and the distinct character of this "taking"—a legislative act directly stripping Americans of their rights, with no outside sovereign involved in the deprivation until after the U.S. had already acted.

81. When the United States created a new nation from its territory rather than selling or gifting it, and did so in a way that foreseeably and directly deprived its own citizens of constitutionally-protected property rights (without providing for compensation), the Takings Clause should apply. The uniqueness of this scenario—the **lack of intervening foreign sovereign** and the **direct, legislative origin of the loss**—distinguishes it from ordinary transfers or cessions and strengthens the claim of Americans (including those living and wanting to own land in the Philippines today in 2025) to compensation for the taking of their rights.

82. **But-For Causation**: But for the U.S. Congress enacting the Tydings-McDuffie Act and subsequent recognition of Philippine sovereignty, Americans in the

Philippines would still be able to own land by virtue of laws applicable under U.S. territorial sovereignty.

83. **Foreseeability**: At the time of independence, it was plainly foreseeable that the Philippines—like many post-colonial states—would assert national control over real property, imposing restrictions on foreign ownership. This was the **direct and likely result** of the transition engineered by the U.S. government.

84. The deprivation of property rights for U.S. citizens present and future was thus not only a consequence, but an ***anticipated outcome*** of the U.S. government's own action.

## DECLARATIONS REQUESTED: NOTICE OF CONSTITUTIONAL QUESTIONS

85. I ask the Court to make several declarations of law to define my rights as a U.S. Citizen born at Camp LeJeune, North Carolina, in 1969, given I now live in the Philippines.

86. The following questions constitute my NOTICE OF CONSTITUTIONAL QUESTIONS under FRCP Rule 5.1.

87. **QUESTION 1**: Did Congress have power under the U.S. Constitution to pass a statute like Tydings-McDuffie Act creating a sovereign nation such as the Philippines?

88. **QUESTION 2**: Assuming Philippines individuals had obligations of allegiance to the United States under Tydings-McDuffie Act, was it insurrection to seek independence and thus rebellion that the Constitution allowed the president to suppress?

89. **QUESTION 3**: Congress can buy and sell territory from and to other sovereign nations, but can Congress simply set regions owned by the United States "free" and create sovereign nations out of parts of its territories without selling them to anyone?

90. **QUESTION 4**: Does the power to create sovereign nations rest with "The People" per the Declaration of Independence and the Tenth Amendment, or can Congress appropriate this power and use it to create nations? What provision in the Constitution creates this power in Congress and takes it from The People?

91. **QUESTION 5**: If the creation of the Philippines as a sovereign nation was unconstitutional and thus disallowed to Congress, and the Philippines prior July 4, 1946, was part of the United States since 1898, do I retain the same status and rights in the Philippines in 2025 as I would have had in the Philippines as of **July 3, 1946**?

92. **QUESTION 6**: Do I have the same rights to statutory and constitutional rights derived from the United States as U.S. citizens had during the American Period in the Philippines, through and as of July 3, 1946?

93. **QUESTION 7**: If the Philippines was not constitutionally granted sovereignty, am I as a U.S. citizen granted all the rights of equality in Tydings-McDuffie Act as Filipinos have to property ownership and so on?

94. **QUESTION 8**: The **Philippine Organic Act of 1902** (also known as the Philippine Bill of 1902) formally established the Philippines as an American

"unorganized" territory and provided for a civilian government with a popularly elected assembly. c. 1369, 32 Stat. 691 (July 1, 1902). Importantly, this act **extended the U.S. Bill of Rights to the Philippines**, thereby applying some fundamental civil rights protections to Filipinos under American rule. Thus: (a) Given this, if the Philippines did not get independence as a matter of law vis-à-vis **myself** and **my own rights**, do I still have those U.S. Bill of Rights protections in the Philippines as were granted in that 1902 law? (b) Which officials in the Philippines must abide by those rights? (c) Does the U.S. State Department need to abide by those rights given the offices in Manila and Cebu are not on foreign soil, if indeed it is still U.S. territory?

95. **QUESTION 9**: Does the U.S. Supreme Court still retain jurisdiction over the highest court in the Philippines for appeals?

96. **QUESTION 10**: May Congress exclude me as a matter of Equal Protection from using my Medicare or any other federal benefit in the Philippines, given I have exercised my plenary right to travel *within* the United States, if it is?

97. **QUESTION 11**: If Tydings-McDuffie is only partially unconstitutional, removing only independence, am I allowed to run for office in the Commonwealth of the Philippines as a U.S. citizen? Corollary: Does that Commonwealth in fact still exist or not?

98. **QUESTION 12**: Please compare the Tydings-McDuffie Act language creating a Commonwealth with the language in the acts creating the States of Hawaii and Alaska. Did Tydings-McDuffie create a state rather than a foreign nation?

18

99. **QUESTION 13**: If it did create a state, that state would be the largest U.S. state by population, dwarfing California. Does the Philippines have a right to representation in the U.S. Senate or U.S. House?

100.     **QUESTION 14**: Do Philippines citizens have a right to vote for President and Vice President of the United States and U.S. House and U.S. Senate and how many Electoral College votes should it have? Corollary: Am I allowed, as a U.S. citizen, to vote in the Philippines for those offices and register to vote in the Philippines to vote for these federal offices, or run for them?

101.     **QUESTION 15**: As a resident of the Philippines from 2018 to present, was I present in the United States for that entire time?

102.     **QUESTION 16**: If the Philippines is United States territory, do the Americans with Disabilities Act and Rehabilitation Act and other civil rights laws apply to the Philippines and protect me as a U.S. citizen here?

103.     **QUESTION 17**: Whether the government of the Philippines may ban Americans from owning land or other real estate interests (liens, etc.) in that area, or if this violates the property rights inherent in the Fifth Amendment?

104.     **QUESTION 18**: If the United States in gifting nationhood to the Philippines (constitutionally or not) can engage in a Taking of my rights as a U.S. citizen to buy and own land in those islands, and if that property right can be extinguished, what Takings compensation may I have for no longer being able to purchase Philippines land as an American citizen like I could from 1898-1946?

105.    This last question is relevant to me because I live in the Philippines and am engaged to a citizen of the Philippines and I am building a house in Occidental Mindoro without the right to have my name on the title, only my fiancée's name. I have been giving all my SSDI benefit money and any other as a gift to her so she can build a house in her name with her name on the title. It is relevant to have a picture of the house I have paid to be built in San Jose, Mapaya III Barangay, Occidental Mindoro. This is my house, being built with my money, small though that amount is and slow the progress, but I have to *give away* my money to do it because __I cannot own real property here__.



PHOTO 1

20



PHOTO 2

Above: House of **Rosanna Indap Quijano**, July 12-17, 2025.

## JURISDICTION AND VENUE

106.     I raise questions of federal law and constitutional law. Jurisdiction is under 28 U.S.C. § 1330 due to the Philippines being a party and involves application of the declaratory judgement law, 28 U.S.C. § 2201, as further authorized under FRCP Rule 57. Against the United States, jurisdiction is under 28 U.S.C. § 1331 since these are constitutional questions and statutory judicial review under the Constitution. If the Court indeed finds that the Philippines is still part of the United States as a result of this Action, 28 U.S.C. § 1331 is appropriate. Since it is indisputable that without a valid and constitutional act by Congress to create a nation, the default state of affairs is that the Philippines remains a territory (Commonwealth) until sold by the United States or gifted to another nation, both of which have not happened. The exceptions in 28 U.S.C. § 1605-1607 do not apply given the nature of this action. Note that giving or gifting real estate to private parties does not deprive the Philippines of U.S. territory status; it mere changes who owns that real estate.

107.     This is not a matter for the U.S. Court of Federal Claims under the Tucker Act because no compensation has been requested as yet. The preliminary issue of whether Takings should be due is addressed here. Only the amount would need to be decided in the U.S. Court of Federal Claims and only if the amount fits the jurisdictional requirements, which is unknowable until I make a claim for a specific amount for the Takings of my property rights

by the statute that gave a territory the ability to be a nation outside the enumerated powers of Congress in Article I of the U.S. Constitution.

108.    My defendant is also the United States for passing what I view as an unconstitutional law that affects me and enforcing it for nearly 80 years, **Exhibit 1** being the text.

109.    Prior to "independence" of the Philippines, that territory was under the jurisdiction of the Ninth Circuit U.S. Court of Appeals. The U.S. District Court for the Philippines no longer exists, so I must of necessity file this suit in another U.S. District Court. I choose this Court because it allows filings pro se via email, which is a major convenience to me. IFP has also been granted to me twice since last month here.

## THE PLAINTIFF

110.    Plaintiff Andrew U. D. Straw, a U.S. citizen by birth in North Carolina, is currently a resident of San Juan, Occidental Mindoro, The Philippines.

111.    Physical ADDRESS, PHONE, & EMAIL :

Sitio Boundary, Aniar Residence
Brgy Mapaya III
San Jose, Occidental Mindoro 5101
The Philippines
(63) 956-892-6403 (Cell)
andrew@andrewstraw.com

112.    USA contact information:

9169 W. State St # 690
Garden City, ID 83714-1733
Mobile Phone: (847) 807-5237
andrew@andrewstraw.com                http://www.andrewstraw.com

## CONGRESS ABOLISHED IMMUNITIES

113.      Defendants are not immune from application of the Constitution to a statute. *See*, FRCP **Rule 5.1**.

## COUNT I: DECLARATION

114.      Plaintiff incorporates by reference the allegations of the preceding paragraphs.

115.      Plaintiff seeks only answers to the above constitutional and statutory interpretation questions so as to preserve his own rights while living in the Philippines as a U.S. citizen. The property rights that were extinguished now affect me as someone who lives in the Philippines as a U.S. citizen who wants to own land but is blocked by the new Philippines government, a situation wholly the result of actions by the U.S. government in granting independence without the consent of individual Americans, then and in the future, who may lose property rights from that action. People like me.

## CLAIM FOR RELIEF

116.      Plaintiff respectfully requests the Court to enter judgment answering the above 19 questions applying the U.S. Constitution to a 1934 statute.

## TRIAL DEMAND

117.      Plaintiff          requests          a          bench          trial.

I, Andrew U. D. Straw, verify that the above factual contentions and statements are true and correct to the best of my knowledge, information, and belief, on penalty of perjury.  Signed: July 23, 2025.

Respectfully,

s/ ANDREW U. D. STRAW
9169 W. State ST, STE 690
Garden City, ID 83714-1733
Mobile Phone: (847) 807-5237
andrew@andrewstraw.com

## CERTIFICATE OF SERVICE

I, Andrew U. D. Straw, certify that on <mark>July 23, 2025</mark>, I sent this **AMENDED COMPLAINT** and **4 EXHIBITS** via email to the Clerk of this Court. Counsel for Defendant is the Attorney General of the United States, Hon. Pamela Bondi.

Respectfully submitted,

s/ ANDREW U. D. STRAW
*Pro Se Plaintiff*
9169 W. State ST, STE 690
Garden City, ID 83714-1733
Mobile Phone: (847) 807-5237
andrew@andrewstraw.com


## EXHIBIT LIST

- ➢ EXHIBIT 1 – Text of Tydings-McDuffie Act of 1934

- ➢ EXHIBIT 2 – USN Service Record of Gerald LeRoy Isaacs & Bronze Star

- ➢ EXHIBIT 3 – Perplexity on Takings Clause Issue

- ➢ EXHIBIT 4 – Perplexity on Straw's Unconstitutionality of Independence Issue